**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JESUS RODRIGUEZ SANDOVAL, et al.,    )
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,    )
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　v.    )　　　　　　　　2:10-cv-1196-RCJ-PAL
　　　　　　　　　　　　　　　　　　　　　　　　　)
LAS VEGAS METROPOLITAN POLICE    )　　　**ORDER**
DEPARTMENT, et al.,    )
　　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.    )
_____    )

　　　This case involves claims of constitutional right violations, intentional infliction of emotional distress, assault and battery, and false imprisonment which allegedly occurred when officers of the Las Vegas Metropolitan Police Department entered the plaintiffs' home under the incorrect belief that a burglary was in progress.  The Las Vegas Metropolitan Police Department along with Defendants Sergeant Jay Roberts and Officers Michael Dunn, Christopher Kohntopp, Justin Byers, and Troy Givens (collectively "Defendants") have filed a motion for summary judgment (#31).  For the following reasons, Defendants' motion for summary judgment is granted.

**BACKGROUND**

**I.　Facts**

　　　At approximately 1:45 p.m. on October 24, 2009, the Las Vegas Metropolitan Police Department ("LVMPD") received a 911 call from Albert Schouten reporting a prowler and possible burglary at 31 Onyx Way in Las Vegas, Nevada.  (Schouten Stat. (#31-3); Roberts Dep. (#31-4) at 105).  Schouten reported seeing two white males going over a fence into the backyard of 31 Onyx Way and attempting to open the sliding back door.  (Schouten Stat. (#31-

3); Incident Recall (#35-9)).  The home was occupied by the Rodriguez family, which included Jesus Rodriguez Sandoval ("Sandoval"), his wife Adriana Rodriguez, and their two children, Henry Brian Rodriguez ("Henry") (who was age eighteen at the time of the incident), and Kenya Rodriguez (who was age nine at the time of the incident).  (Sandoval Dep. (#31-1) at 25, 28).  Before the police arrived, one of the two suspected prowlers jumped back over the fence and was picked up by a maroon SUV.  (Schouten Stat. (#31-3)).  Sergeant Jay Roberts then arrived on the scene and interviewed Schouten, who pointed out the house the subjects had apparently attempted to enter.  (*Id.*; Roberts Dep. (#31-4) at 118).  Sergeant Roberts was concerned over the possible burglary because there had been a rash of daytime burglaries in the area where youth would skip school and ransack homes.  (Roberts Dep. (#31-4) at 119).

Officer Michael Dunn then arrived on the scene and Sergeant Roberts instructed him to cover the front of the home.  (*Id.* at 120).  Officer Christopher Kohntopp then arrived and Sergeant Roberts instructed him to cover the back of the home while Sergeant Roberts and Officer Dunn investigated.  (*Id.*).  Upon approaching the home, Sergeant Roberts and Officer Dunn observed that the side gate had been opened along with the security door to the garage and the door to the shed in the backyard.  (*Id.* at 122-23; Dunn Dep. (#31-5) at 61).  These factors combined with the fact that daytime burglaries by youth were common in the area caused Sergeant Roberts to become concerned that a burglary may be occurring.  (Roberts Dep. (#31-4) at 122-23; Dunn Dep. (#31-5) at 61).

Sergeant Roberts and Officer Dunn then proceeded into the backyard, where Officer Dunn checked the shed to see if anyone was there.  (Roberts Dep. (#31-4) at 129).  The officers then approached the rear sliding door that Schouten had indicated the suspects had attempted to open and noticed it to be ajar a few inches.  (*Id.* at 129-30).  Sergeant Roberts instructed Officer Dunn to cover the sliding door while Sergeant Roberts set out to finish clearing the backyard.  (*Id.* at 132).  As Sergeant Roberts approached the window to the home with his gun drawn in the low-ready position, he observed three young males moving around in the room.  (*Id.* at 135-36, 157).  Unknown to the officers, the three males were Henry and his friends Jordhy Leal and David Madueno, whom Henry had invited over to play video

games, watch television, and listen to music.  (Henry Dep. (#31-7) at 24, 28).

Sergeant Roberts stated that his first inclination upon sighting the three males in the room was that these were the suspects and that they were ransacking the room.  (Roberts Dep. (#31-4) at 136).  With his gun pointed inside the bedroom window, Sergeant Roberts yelled "Metro Police, put your hands up." (*Id.* at 154; Henry Dep. (#31-7) at 34).  Henry claims Sergeant Roberts began yelling conflicting commands, such as "Don't move!" and "Turn down the music."  (Henry Dep. (#31-7) at 34).  Upon hearing Sergeant Roberts make multiple commands to the suspects to show him their hands and to "stop reaching for stuff", Officer Dunn entered the home through the sliding door to help control the situation, because Sergeant Roberts could not from his position.  (Dunn Dep. (#31-5) at 76).

Officer Dunn then posted up the hallway and took over as lead officer due to his position and started to give verbal commands to the three young men.  (*Id.* at 81).  Officer Dunn ordered the young men to exit the room and to show him their hands.  (*Id.* at 84-85).  Before complying with the command, Henry told Sergeant Roberts that he had to take care of his dog (a pit bull) who was in the room with them, but was instructed to open the front door.  (Henry Dep. (#31-7) at 34-35).  As the suspects exited the room, the dog ran past the young men and lunged at Officer Dunn.  (Dunn Dep. (#31-5) at 86).  When the dog was less than two feet away from Officer Dunn and about one foot from David, Officer Dunn shot the dog in the face.  (*Id.* at 87; David Dep. (#31-8) at 33).  Officer Dunn reported the shooting over the radio and requested animal control.  (Dunn Dep. (#31-5) at 113).  Henry grabbed the dog and Officer Dunn ordered Jordhy and David to get on the ground.  (*Id.* at 88; Jordhy Dep. (#31-2) at 54).  Jordhy and David were handcuffed and led outside along with Henry, who was holding the pit  bull.  (Jordhy Dep. (#31-2) at 56, 65).  While leading the young men outside, the officers inquired as to who they were and why they were on the property.  (*Id.* at 66).  Jordhy and David were sat down on the front lawn for forty minutes while Henry remained with the dog.  (*Id.* at 66, 89).  Henry was understandably upset that his dog had been shot and repeatedly screamed at the officers, "why the f*** they shoot my dog."  (Henry Dep. (#31-6) at 58).

Henry was then allowed to call his father.  (*Id.* at 60).  Once Sandoval heard of the incident from Henry, he rushed home with his daughter, Kenya. (Kenya Dep. (#31-8) at 14). Sandoval quickly drove up to the house, exited the vehicle with his cane (which was needed because he was recovering from recent back surgery) and began walking toward the scene. (Sandoval Dep. (#31-1) at 45).  Sandoval had only taken a few steps when he was told to "stop there" by the officers.  (*Id.*).  He did not get any closer but began yelling and cursing at the officers.  (*Id.* at 46-47).  Sandoval saw Henry covered in blood and believed his son had also been shot.  (*Id.* at 43).  An officer instructed him to "calm down" and began explaining to him what had transpired.  (*Id.* at 47-48).  He was still very upset and attempted to approach the scene but was denied by the officers.  (*Id.* at 50-51).  At this point, Sergeant Roberts instructed that Sandoval be handcuffed, and an officer grabbed him by his arm and pulled up, making it difficult for him to walk.  (*Id.* at 51, 53).  Sandoval told the officer he had just had surgery and that the action was hurting him.  (*Id.*).  He was then pushed against the police car and handcuffed.  (*Id.* at 53-54).  Sandoval told the officer "please don't do this, I just had surgery, I had a back surgery about 15 days ago."  (*Id.* at 55).  The officer then placed him face down in the car.  (*Id.* at 56-57).

Due to his recent surgery, Sandoval was in pain and began screaming for his medicine. (*Id.* at 62).  Between 25-30 minutes later, an officer came up to Sandoval and asked him what he wanted.  (*Id.* at 62-63).  Sandoval requested his medicine and the officer obtained it for him, helped him out of the car, and ordered him to stand behind the yellow police tape.  (*Id.* at 63-67).

Animal control eventually arrived on the scene and Henry ran towards the truck and put the dog inside. (Henry Dep. (#31-6) at 72).  Henry was very agitated and started yelling at the officers.  (Givens. Decl. (#31-9); Henry Dep. (#31-2) at 83).  Officer Troy Givens then handcuffed Henry and placed him in the back of his patrol car until Harry calmed down. (Givens. Decl. (#31-9)).  Henry was later released and told to stand behind the yellow tape with his family.  (Henry Dep. (#31-6) at 77).  David and Jordhy were also released.  (Sandoval Dep. (#31-1) at 90; David Dep. (#31-7) at 57).  It was later learned the dog died of its injuries.  (Mot.

for Summ. J. (#31) at 9; Opp'n to Mot. for Summ. J. (#35) at 6).  None of the members of the Rodriguez family or Jordhy or David were ever charged or cited with a crime.  (Roberts Dep. (#31-4) at 52-53).

## II.    The Complaint

Jesus Rodriguez Sandoval, Adriana Rodriguez (individually and as guardian ad litem for Kenya Rodriguez), Henry Rodriguez, Martha Leal (as guardian ad litem for Jordhy Leal), and Monica Moreno (as guardian ad litem for David Madueno) (collectively "Plaintiffs"), filed a complaint on July 19, 2010 against the Las Vegas Metropolitan Police Department, County of Clark, and Doe Officers I-X.  (Compl. (#1)).  Plaintiffs later amended their complaint on May 25, 2011 to add as defendants Sergeant Jay Roberts, Officer Michael Dunn, Officer Christopher Kohntopp, Officer Justin Byers, and Officer Troy Givens.  (Am. Compl. (#15)). The amended complaint contains six causes of action, including: (1) violation of the civil right to life and security of persons under 42 U.S.C. § 1983; (2) municipal liability under 42 U.S.C. § 1983; (3) violation of the civil right to familial relationships under 42 U.S.C. § 1983; (4) intentional infliction of emotional distress; (5) assault and battery; and (6) false imprisonment. (*Id.* at 7-10).

Defendants filed a motion for summary judgment on October 24, 2011.  (Mot. for Summ. J. (#31).  Plaintiff's filed an opposition to the motion for summary judgment on December 7, 2011, and a reply was filed on January 6, 2012.  (Opp'n to Mot. for Summ. J. (#35); Reply (#42)).

## LEGAL STANDARD

The purpose of summary judgment is to dispose of factually unsupported claims and defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material if it may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

When presented with a motion for summary judgment, the court employs a burden-shifting analysis.  When the moving party would bear the burden of proof at trial, it must present evidence "which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).  In such circumstances, "the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *Id.*  In contrast, when the nonmoving party would bear the burden of proving the claim or defense, the moving party may satisfy its burden in two ways: (1) by presenting evidence which negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party has failed to make a showing sufficient to establish an essential element to that party's case on which that party would bear the burden of proof at trial.  *See Celotex Corp.*, 477 U.S. at 323-24.  If the moving party fails to satisfy its initial burden, the court must deny the motion for summary judgment and need not consider the nonmoving party's evidence.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets its initial burden, the burden will then shift to the opposing party to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To show a genuine issue of material fact, the opposing party is not required to establish a material issue of fact conclusively in its favor.  Rather, it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).  In essence, the nonmoving party cannot avoid summary judgment by solely relying on conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The opposition must go beyond the allegations and assertions of the pleadings and set forth specific fact by providing the court with competent evidence that establishes a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

1      At the summary judgment stage, the court is not to weigh the evidence and determine

2 the truth, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477

3 U.S. at 249.  The evidence of the nonmovant must be believed, and all justifiable inferences

4 drawn in his favor. *Id.* at 255.  If the evidence of the nonmoving party is simply colorable or

5 it is not significantly probative, summary judgment may be granted. *See id.* at 249-50.

6 **DISCUSSION**

7 **I.**    **Plaintiffs' Claims for Violations of Their Constitutional Rights**

8      Plaintiffs have brought several claims under 42 U.S.C. § 1983 for violations of their

9 rights under the United States Constitution.  "[Title] 42 U.S.C. § 1983 provides a remedy to

10 individuals whose constitutional rights have been violated by persons acting under color of

11 state law." *Burke v. Cnty. of Alameda*, 586 F.3d 725, 731 (9th Cir. 2009) (quoting *Caballero*

12 *v. City of Concord*, 956 F.2d 204, 206 (9th Cir.1992)).  To sustain an action under § 1983, a

13 plaintiff must prove: (1) that a defendant acted under color of state law; and (2) the conduct

14 deprived the plaintiff of a right secured by the Constitution or laws of the United States. *See*

15 *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997).  There is no dispute that

16 Defendants acted under color of state law.  Consequently, the Court need only determine

17 whether Plaintiffs were deprived of rights secured by the Constitution.

18      Plaintiffs advance three claims under the United States Constitution.  First, Plaintiffs

19 allege they were deprived of the civil right to life and security.  (Am. Compl. (#15) at 7).

20 Second, Plaintiffs allege municipal liability.  (*Id.* at 8).  Third, Plaintiffs allege Defendants

21 violated their civil right to familial relationships.  (*Id.*).

22    **A.**    **Violations of Civil Rights to Life and Security of Persons**

23      Defendants contend that the officers are entitled to qualified immunity on Plaintiffs first

24 cause of action for violations of civil rights to life and security of persons.  (Mot. for Summ. J.

25 (#31) at 28).  Government officials performing discretionary functions may be shielded from

26 personal liability for their actions under the doctrine of qualified immunity. *Harlow v. Fitzgerald*,

27 457 U.S. 800, 818 (1982).  Qualified immunity is "an *immunity from suit* rather than a mere

28 defense to liability" and is an appropriate basis for granting summary judgment. *Mitchell v.*

7

1   *Forsyth*, 472 U.S. 511, 526 (1985).   The doctrine of qualified immunity protects government

2   officials "from liability for civil damages insofar as their conduct does not violate clearly

3   established statutory or constitutional rights of which a reasonable person would have known."

4   *Harlow*, 457 U.S. at 818.  Qualified immunity protects "all but the plainly incompetent or those

5   who knowingly violate the law."  *Malley v Briggs*, 475 U.S. 335, 341 (1986).  Officers can have

6   a reasonable, but mistaken, belief about the facts or about what the law requires in a certain

7   situation and still be entitled to qualified immunity.  *Saucier v. Katz*, 533 U.S. 194, 205 (2001),

8   *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *Estate of Ford v.*

9   *Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).

10      Analyzing whether a government official is entitled to qualified immunity involves two

11  questions: (1) whether the facts alleged, in the light most favorable to the plaintiff, show the

12  official violated a constitutional right; and (2) whether the right was clearly established such

13  that a reasonable government official would know the conduct was unlawful.  *Saucier*, 533

14  U.S. at 201.  The court has discretion as to which prong will be addressed first under the

15  particular circumstances presented, and if the answer to either is "no," then the official may

16  not be held liable for damages.  *Pearson*, 555 U.S. at 236.

17      Plaintiffs' first cause of action alleges that Defendants deprived Plaintiffs of their right

18  to due process, the right to be free from excessive force, and the right to be free from pre-

19  conviction punishment under the Fourth and Fourteenth Amendments, and the right to equal

20  protection as secured by the Fourteenth Amendment.  (Am. Compl. (#15) at 7).  Although the

21  claim seemingly purports to allege a substantive due process violation, the United States

22  Supreme Court has held that all constitutional claims, including those for excessive force,

23  which result from an arrest, investigatory stop, or other seizure of a free citizen are to be

24  analyzed under the Fourth Amendment rather than under a substantive due process

25  approach.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Plaintiffs seem to concede this in

26  their opposition to the motion for summary judgment by only discussing the violation under the

27  framework of the Fourth Amendment.  (*See* Opp'n to Mot. for Summ. J. (#35) at 6).  Therefore,

28  under the first cause of action the Court need only address whether the officers violated either

the Fourth Amendment or the Equal Protection Clause of the Fourteenth Amendment as they investigated and detained Plaintiffs.

### 1.    Fourth Amendment Claims

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).  The Supreme Court has long recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396.  But where the use of force is excessive under objective standards of reasonableness, it violates the protections guaranteed under the Fourth Amendment. *Id.* at 397.

Whether the force used to effect a seizure is "reasonable" under the Fourth Amendment requires the court to balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.  *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 (9th Cir. 2005) (citing *Graham*, 490 U.S. at 396).  The reasonableness of an arrest or seizure must be assessed by "carefully considering the objective facts and circumstances that confronted the arresting officer or officers."  *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97.  The court must judge the reasonableness from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight.  *Id.* at 396.

In balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake, the court must conduct a three-part analysis.  *Espinosa v. City & Cnty. Of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).  The court first must assess "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.' "  *Id.* (citing

1   *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003).  Second, the court must assess the

2   importance of the government interests at stake by assessing: (1) the severity of the crime at

3   issue, (2) whether the suspect posed an immediate threat to the safety of the officers or

4   others, and (3) whether the suspect was actively resisting arrest or attempting to escape.  *Id.*

5   The factor regarding the safety of officers or others is the most important, *Smith v. City of*

6   *Hemet*, 394 F.3d 689, 702 (9th Cir. 2005), and there must be objective factors that suggest

7   that there is a threat to a person's safety, *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir.

8   2001).  Finally, the court must balance the gravity of the intrusion against the government's

9   need for that intrusion.  *Espinosa*, 598 F.3d at 537.

### i.    Force Used Against Henry, Jordhy, and David

11          The force used against Henry, Jordhy, and David included being handcuffed and having

12   the officers' weapons pointed at them.  Being detained for nearly forty minutes is only mildly

13   intrusive, but  having a gun pointed at Plaintiffs is more intrusive and may serve as the basis

14   for a § 1983 claim for violation of Plaintiffs' Fourth Amendment rights.  *Robinson v. Solano*

15   *Cnty.*, 278 F.3d 1007, 1014-15 (9th Cir. 2002).

16          An important government interest however was at stake because the officers

17   reasonably believed that the three young men were committing a burglary.  As the record

18   shows, a witness called 911 and reported that at least two young men were prowling around

19   the home and possibly attempting to gain access.  (Schouten Stat. (#31-3); Incident Recall

20   (#35-9)).  The home was located in an area where youth had previously committed burglaries

21   during daytime hours.  (Roberts Dep. (#31-4) at 119).  When the officers arrived on the scene,

22   they found that the gate, shed door, security door to the garage, and the door though which

23   the witness claimed the suspects attempted to enter were all open.  (Roberts Dep. (#31-4) at

24   122-23; Dunn Dep. (#31-5) at 61).  The officers then found three young men within the home

25   and reasonably concluded that these may very well be the suspects they were seeking and

26   they were committing a burglary.  In Nevada, burglary is considered to be a very serious crime.

27   *See Matter of Seven Minors*, 664 P.2d 947, 954 (Nev. 1983), *disapproved of on other grounds*

28   *by In re William S.*, 132 P.3d 1015 (Nev. 2006).  This is because "[i]t is an offense which

1   conduces towards violence and may cause serious and permanent psychological harm to the

2   victim." *Id.*

3       Furthermore, the officers had reason to believe there was a threat to their own safety

4   and the safety of others.  The Ninth Circuit has emphasized that "when officers suspect a

5   burglary in progress, they have no idea who might be inside and may reasonably assume that

6   the suspects will, if confronted, flee or offer armed resistance.  In such exigent circumstances,

7   the police are entitled to enter immediately, using all appropriate force." *Frunz v. City of*

8   *Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006).   Furthermore, "[i]n burglary cases, the

9   possibility that a lawful resident has been injured or is being held hostage gives rise to exigent

10  circumstances." *United States v. Mancinas-Flores*, 588 F.3d 677, 687 (9th Cir. 2009) (citing

11  *United States v. Washington*, 573 F.3d 279, 288 (6th Cir. 2009)).   Because the officers

12  reasonably suspected that a burglary was in progress, they had cause to believe there was

13  a threat to themselves and possibly others.

14      Objective factors also suggested Officer Dunn was in danger when he entered the

15  home.  He heard Sergeant Roberts repeatedly yell at the suspects, which could lead him to

16  believe Sergeant Roberts could not control the situation from his position and the suspects

17  were potentially noncompliant.  Upon entering the home, the family pit bull charged at Officer

18  Dunn. Although Plaintiffs claim the dog had never bitten anyone in the past, Officer Dunn had

19  no reason to know that.   All that was known was that he stood before three potentially

20  dangerous suspected burglars and a lunging pit bull.

21      In balancing the gravity of the intrusion against the government's need for the intrusion,

22  it becomes clear that because the officers reasonably believed a burglary was in progress and

23  used no more force than was necessary in controlling the situation until the facts were known,

24  these actions did not violate Plaintiffs' Fourth Amendment rights.

25              **ii.     Force Used Against Sandoval and Henry**

26      The force used against Sandoval and Henry included handcuffing them and detaining

27  them in the back of a police vehicle.  The severity of the act of handcuffing Sandoval and

28  Henry and detaining them for less than forty minutes is relatively mild.  The government also

had an interest in detaining them because they had become agitated and the officers needed to retain control over the situation.  The government has a substantial interest in exercising unquestioned command of the situation in order to protect the officers and others present. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (noting that officers have the right to use some degree of physical force in making an arrest or investigatory stop); *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) (holding that the Fourth Amendment was not violated when officers used force against a plaintiff who refused to comply with officers' commands and interfered with their ability to maintain order).

In the matter before the Court, Sandoval arrived quickly on the scene, appeared agitated, swore at the officers, and failed to obey their commands.  Although Sandoval claimed that he had back surgery just fifteen days prior to the incident, officers are not required to refrain from the use of force, such as handcuffing, due to mere allegations of a pre-existing injury. *Winterrowd v. Nelson*, 480 F.3d 1181, 1184 (9th Cir. 2007) (stating "a police officer need not endanger himself by unduly crediting a suspect's mere claim of injury" because individuals may feign injuries for improper motives).  In balancing the mild force used against the substantial interest the government has in allowing officers to control the situation while investigating a possible crime scene, it is apparent that the government's interest outweighs the harm to Sandoval.  The officers had no way of knowing the extent of Sandoval's surgery and are not required to accommodate all parties who claim injuries.  Sandoval was also agitated and refused to comply with the officers commands.  The officers accordingly acted reasonably with regard to the force used against Sandoval.

Henry was similarly handcuffed after he placed his dog in the animal control vehicle. Henry was understandably upset and was cursing at the officers and acting irrationally. (Givens. Decl. (#31-9); Henry Dep. (#31-2) at 83).  As previously stated, the government has a significant interest in allowing its law enforcement officers to control the situation while investigating a potential crime scene and in protecting the officers and others present. *See Graham*, 490 U.S. at 396; *Jackson*, 268 F.3d at 653.  Henry here was agitated and acting irrationally, and to maintain control over the situation Officer Givens handcuffed him and

12

placed him in the back of his vehicle to calm him down.  (Givens. Decl. (#31-9)).  Henry acknowledged that Officer Givens was nice to him, made him feel comfortable, and calmed him at least somewhat after his dog was given to animal control.  (Henry Dep. (#31-6) at 73).  In balancing the government interest in this matter against the mild intrusion of handcuffing Henry to calm him down, it is apparent that the amount of force used in this matter was reasonable.

### iii.    Shooting the Family Dog

Plaintiffs also contend that Officer Dunn used excessive force in shooting the family dog.  (Opp'n to Mot. for Summ. J. (#35) at 12-15).  A dog is not a person and therefore is not entitled to protection under the Fourth Amendment.  *See* U.S. CONST. amend IV (protecting "[t]he right of the *people* to be secure in their persons, houses, papers, and effects") (emphasis added); *Altman v. City of High Point, N.C.*, 330 F.3d 194, 200 (4th Cir. 2003) (holding that a dog is not a "person" under the Fourth Amendment).  However, an owner may bring a claim against the government actor for violating the Fourth Amendment for an unconstitutional seizure of the owner's property if the manner in which the dog was taken or killed was unreasonable.  *See San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005); *Fuller v. Vines*, 36 F.3d 65, 67-68 (9th Cir. 1994), *overruled on other grounds by Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013 (9th Cir. 2002).

The complaint here fails to allege that Defendants engaged in an unconstitutional seizure of Plaintiffs' property.  Although the complaint alleges Plaintiffs were deprived of "life" and "liberty" in violation of the Fourth and Fourteenth Amendments, Plaintiffs never assert that they were unconstitutionally deprived of their "property."  (*See* Compl. (#15) at 7).  Even if Plaintiffs had alleged the seizure of their property in violation of the Fourth Amendment in their complaint, the seizure here was not unreasonable.  Although the loss of the animal is a significant intrusion, the pit bull was charging at Officer Dunn at the time it was shot.  (Dunn Dep. (#31-5) at 87).  Officer Dunn's safety clearly outweighed the loss of the property interest Plaintiffs had in the animal.  While Officer Dunn did not attempt nonlethal methods of restraining the dog before shooting, this was a rapidly evolving situation in which Officer Dunn

was required to make a split second decision in how to protect himself. Such actions must be judged from the perspective of the officer at the scene rather than with the 20/20 vision of hindsight. *See Graham*, 490 U.S. at 396. From Officer Dunn's perspective, a pit bull was racing toward him while he was standing before three suspected burglars who may have been noncompliant and reaching for items when Sergeant Roberts first discovered them. Based on the information available to Officer Dunn at the time, it cannot be said his actions were unreasonable.

### iv.    Entering Plaintiffs' Home

Plaintiffs additionally argue that Officer Dunn's entry into the home constituted an unreasonable search in violation of the Fourth Amendment. "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). However, because the ultimate touchstone of the Fourth Amendment is "reasonableness", certain exceptions to the warrant requirement exist. *Id.* For instance, the Supreme Court has recently held that "the Fourth Amendment permits an officer to enter a residence if the officer has a reasonable basis for concluding that there is an imminent threat of violence." *Ryburn v. Huff*, --- S.Ct. ----, 2012 WL 171121, at *3 (2012); *see also Frunz v. City of Tacoma*, 468 F.3d 1141, 1145 (9th Cir. 2006) ("[W]hen officers suspect a burglary in progress, they have no idea who might be inside and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance. In such exigent circumstances, the police are entitled to enter immediately.").

Officer Dunn here had a reasonable belief that an imminent threat of violence existed. There were numerous indications that a burglary may have been in progress, including the fact burglaries by youth were common in the area, an eyewitness reported seeing two young men prowling around the home, and open doors. (Roberts Dep. (#31-4) at 119; Dunn Dep. (#31-5) at 61). While investigating the potential burglary, Officer Dunn was instructed by Sergeant Roberts to watch the open sliding glass door so that the officers would not be surprised if somebody exited the residence while Sergeant Roberts finished clearing the north part of the

14

backyard.   (Roberts Dep. (#31-4) at 132).   He then observed Sergeant Roberts raise his weapon to the bedroom window and repeatedly yell at the suspects "let me see your hands" and "stop reaching for stuff".   (Dunn Dep. (#31-5) at 70-72).   This could reasonably lead Officer Dunn to conclude that the suspects in the room presented a threat, that they were not complying with Sergeant Roberts' commands, and that they were potentially reaching for weapons.   In addition, Officer Dunn stated that he heard the tone of Sergeant Roberts voice suddenly change while addressing the suspects, which could lead him to believe the situation had become dangerous.   (*Id.* at 72).   Because Officer Dunn had a reasonable basis for concluding that there was an imminent threat of violence based on the evidence available to him at the time, his decision to enter the home was not objectively unreasonable and Plaintiffs' Fourth Amendment rights were not violated by the action.

## 2.     Equal Protection Claim

Plaintiffs' second claim within their first cause of action is for depravation of the right to equal protection under the laws.   "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."   *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).   "To establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional."   *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003).   "Discriminatory intent may be proved by direct or indirect evidence."   *FDIC v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991).   To survive a motion for summary judgment, a plaintiff must "produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [the action] was racially motivated."   *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 754 (9th Cir. 2001) (quoting *Henderson*, 940 F.2d at 473).   "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."   *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

1     Plaintiffs here claim that the officers intentionally discriminated against them due to their
2   race.  (Opp'n to Mot. for Summ. J. (#35) at 18-19).  As evidence of discriminatory intent,
3   Plaintiffs note that the officers had been told the suspects were two white males, and therefore
4   they had no reason to believe that the three Hispanic youths were engaged in criminal activity.
5   (*Id.* at 18).  Plaintiffs seem to submit that this alone is enough to establish a genuine issue of
6   material fact.  (*Id.* at 19).  The fact the youth were Hispanic rather than white is insufficient to
7   establish that the officers' conduct was motivated by discriminatory intentions because
8   witnesses' perceptions can often be inaccurate.  Schouten—the witness who reported the
9   prowler—from a distance easily could have confused the skin color of a Hispanic as white.
10  Due to his vantage point, he also may not have seen a suspect enter the home from the front,
11  and therefore the fact there were three people in the home rather than only two does not show
12  the officers had any discriminatory intentions.  Additionally, Sergeant Roberts noted that based
13  on Schouten's description, he would have stopped any young male he found in the area
14  because his training and experience has taught him that the perception of witnesses is not
15  always accurate.  (Roberts Dep. (#31-4) at 127).  No evidence has been presented to show
16  the officers made any derogatory statements regarding Hispanics or that the officers have any
17  history of discriminating against Hispanics.  Ultimately Plaintiffs allegations that they were
18  discriminated against based on their race amount to nothing more than speculation that the
19  officers acted the way they did because Plaintiffs are Hispanic.  Because mere speculation is
20  not enough to establish a genuine issue of material fact, *Nelson*, 83 F.3d at 1081-82,
21  Defendants' motion for summary judgment is granted as to this claim.

22              **3.      The Officers Are Entitled to Qualified Immunity**

23     Because the officers acted reasonably, Defendants are entitled to qualified immunity
24  on the ground that Plaintiffs' Fourth Amendment rights were not violated.  *See Saucier v. Katz*,
25  533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223
26  (2009).  Defendants are also entitled to qualified immunity because it cannot be said that the
27  rights of Plaintiffs were so clearly established that a reasonable official would have known the
28  conduct was unlawful.  *Id.*  The officers reasonably believed  Henry, Jordhy, and David were

16

burglars.  Although that belief was ultimately mistaken, the belief was still reasonable and therefore the mistake of fact does not bar Defendants from asserting qualified immunity.  *See Saucier*, 533 U.S. at 205; *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).  As stated above, the officers also had the authority to detain Sandoval and Henry while they investigated the matter as they were agitated, acting irrationally, and not complying with the officers' commands.   As there was no constitutional violation and a reasonable government official would not have known the conduct was unlawful, the officers are entitled to qualified immunity.

### B.    Municipal Liability

Plaintiffs also claim municipal liability because they allege the LVMPD had a policy, practice, and custom of negligently hiring, training, and supervising its officers.  (Am. Compl. (#15) at 8).  A municipality may not be found liable under 42 U.S.C. § 1983 under a theory of respondeat superior.  *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978).  A plaintiff who seeks to impose liability on a local government under § 1983 must prove that an " 'action pursuant to official municipal policy' caused their injury."  *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (citing *Monell*, 436 U.S. at 691).  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Id.*

Plaintiffs' claim of municipal liability first fails because there was no constitutional violation.  Yet even if there had been a constitutional violation, municipal liability would not apply because Plaintiffs have provided no evidence that LVMPD had any policy or practice of violating the civil rights of citizens in the manner alleged by Plaintiffs.  Furthermore, Plaintiffs have presented no evidence that would establish that Sergeant Roberts or any other officer was a policymaking official.  Because the record is void of any evidence demonstrating an action pursuant to the official municipal policy of the LVMPD caused Plaintiffs' injuries, Defendants' motion for summary judgment is granted on this claim.

### C.    Depravation of Familial Relations

Plaintiffs also claim that they were deprived of the constitutional right to a family relationship. (Am. Compl. (#15) at 8). The substantive due process right to familial association is well established. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). A parent has a "fundamental liberty interest" in companionship with his or her child. *Kelson v. City of Springfield*, 767 F.2d 651, 654–55 (9th Cir. 1985). State action which interferes with this interest amounts to a violation of substantive due process if the harmful conduct "shocks the conscience" or "offend[s] the community's sense of fair play and decency." *Rosenbaum*, 663 F.3d at 1079 (citing *Rochin v. California*, 342 U.S. 165, 172-73 (1952)). For example, the Ninth Circuit held that a mother stated a claim under § 1983 for a violation of the right to familial association where her mentally-disabled son was mistaken for another person, falsely arrested, and extradited to another state where he was imprisoned for two years, during which time the police department repeatedly misinformed her of his whereabouts. *Lee v. City of Los Angeles*, 250 F.3d 668, 685-86 (9th Cir. 2001). The Ninth Circuit has also held that parents had stated a cause of action for a violation of the right to familial association when their son committed suicide at school. *Kelson*, 767 F.2d at 653-55.

Plaintiffs here argue that they were deprived of the right to familial association when the officers shot the family dog and used excessive force on the youths and Sandoval. (Opp'n to Mot. for Summ. J. (#35) at 15). Keeping Sandoval and Henry separated for forty minutes is hardly conduct that shocks the conscious or would offend society's sense of decency. *See Rosenbaum*, 663 F.3d at 1079-80 (finding that the right to familial association was not violated when the plaintiff's children were taken from him because they were not separated for an extended period of time). Often such short detentions are necessary to allow police to sort through the facts and determine what has transpired.

Although shooting the family dog was obviously a traumatic event for the family, it does not result in the deprivation of a familial relationship. The right to familial association generally only applies in parent-child relationships. *See, e.g., Lee*, 250 F.3d at 685-86; *Kelson*, 767 F.2d at 653-55; *Morrison v. Jones*, 607 F.2d 1269, 1275 (9th Cir. 1979), *cert. denied*, 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). Although many people have close relationships

18

with their pets, the owner-pet relationship is not a parent-child relationship.  Furthermore, Plaintiffs have failed to cite any legal authority which would justify the extension of the right of familial association to relationships owners have with their animals.  For these reasons, the loss of the family dog consequently does not deprive Plaintiffs' of their right to familial association.

**II.    Plaintiffs' State-Law Claims**

Plaintiffs have also asserted state-law claims for intentional infliction of emotional distress, assault and battery, and false imprisonment.  These claims fail for two reasons.  First, the officers are entitled to discretionary-function immunity under NRS § 41.032 because they were effectuating an arrest.  Second, no genuine issue of material fact exists and Defendants are entitled to judgment as a matter of law on these claims.

**A.    Discretionary-Function Immunity**

Although Nevada has generally waived its state immunity under NRS § 41.031, the State has retained immunity under NRS § 41.032 for officials exercising discretion.  NRS § 41.032(2) states no actions may be brought against an officer of the State or its political subdivision that is "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty" of the officer.  On its face, this statute does not immunize municipal governments or their employees, because municipalities are considered independent corporations or "persons" with their own identities, not mere political subdivisions of a state.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  The Nevada Supreme Court, however, has implicitly assumed that municipalities are political subdivisions of the State for the purposes of applying the discretionary act immunity statute.  *See, e.g., Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353, 1354-55 (Nev. 1987).

In determining whether immunity applies under NRS § 41.032, the Nevada Supreme Court has adopted the general principles of federal jurisprudence as to discretionary-function immunity, holding that the actions of state officers are entitled to discretionary-function immunity if their decision (1) involves an element of individual judgment or choice and (2) is based on considerations of social, economic, or political policy.  *Martinez v. Maruszczak*, 168

P.3d 720, 727, 729 (Nev. 2007).   Decisions at all levels of government, including routine decisions, may be protected by discretionary-function immunity so long as both criteria are satisfied.    *Id.* at 729.   Additionally, "the discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation so long as the agency does not violate a mandatory directive." *Vickers v. United States*, 228 F.3d 944, 951 (9th Cir. 2000).   In analyzing discretionary-function immunity, a court does not ask whether the official abused his or her discretion, but only whether the acts concerned a matter in which the official had discretion.   *See* NEV. REV. STAT. § 41.032(2)

Based on the facts of this case, the officers are entitled to discretionary-function immunity.   A law enforcement officer is generally afforded discretionary-function immunity in conducting an investigation and effectuating an arrest so long as the officer does not violate a mandatory directive in doing so.   *Hart v. United States*, 630 F.3d 1085, 1090 (8th Cir. 2011) ("We readily conclude a federal law enforcement officer's on-the-spot decisions concerning how to effectuate an arrest—including how best to restrain, supervise, control or trust an arrestee—fall within the discretionary function exception to the FTCA absent a specific mandatory directive to the contrary."); *Sabow v. United States*, 93 F.3d 1445, 1453 (9th Cir. 1996) ("Investigations by federal law enforcement officials . . . clearly require investigative officers to consider relevant political and social circumstances in making decisions about the nature and scope of a criminal investigation."); *Mesa v. United States*, 837 F.Supp. 1210, 1213 (S.D. Fla. 1993) ("We hold as a matter of law that the function of determining when and how to execute an arrest warrant is quintessentially a discretionary function, involving choices and judgments that are grounded in policy considerations."), *aff'd*, 123 F.3d 1435 (11th Cir. 1997); *Trujillo v. Powell*, 2011 WL 3419504, at *9 (D. Nev. 2011) (holding that a sheriff who decided to handcuff the plaintiff during a traffic stop was entitled to discretionary-function immunity); *Spear v. City of N. Las Vegas*, 2010 WL 3895761, at *9 (D. Nev. 2010) ("The [officers] are also protected under Nev. Rev. Stat. § 41.032 from the state law torts, because their handling of the situation with [the plaintiff] led to discretionary decisions that 'were concerning the scope and manner in which North Las Vegas Police Department conducts an investigation,' or

1   responds to an emergency call based on the policies of North Las Vegas Police, and did not

2   'violate a mandatory directive.' " (citing *Vickers*, 228 F.3d at 951)).  In determining how to best

3   enforce the law, law enforcement officers are required to consider their training, the need to

4   arrest certain parties, the concern for their own safety, the concern for the arrestee's safety,

5   the public's safety, the resources available to the officer, LVMPD policies, and the information

6   the officer has on hand.  *See Hart*, 630 F.3d at 1091 (citing *Williams v. United States*, 314

7   Fed.Appx. 253, 257-58 (11th Cir. 2009) (unpub. per curiam)).  These factors indicate that the

8   officers' decision to arrest Plaintiffs is "fundamentally rooted in policy considerations, and that

9   judicial second-guessing of this decision thus is not appropriate."  *Mesa v. United States*, 123

10  F.3d 1435, 1438 (11th Cir. 1997).  As the officers' decision to arrest Plaintiffs and investigate

11  involved judgment based on social and policy considerations, and because there is no

12  evidence that the officers violated a mandatory directive during the investigation and arrest,

13  the officers are entitled to discretionary-function immunity under NRS § 41.032(2).

14          **B.      Defendants Are Entitled to Judgment as a Matter of Law**

15          Defendants are also entitled to summary judgment because no genuine issue of

16  material fact exists and they are entitled to judgment as a matter of law on Plaintiffs state-law

17  claims.

18                  **1.      Intentional Infliction of Emotional Distress**

19          Plaintiffs have alleged intentional infliction of emotional distress, claiming they have

20  suffered severe emotional distress resulting from the conduct of the officers.  (Am. Compl.

21  (#15) at 9).  To succeed on a claim for intentional infliction of emotional distress, the plaintiff

22  must show "(1) extreme and outrageous conduct with either the intention of, or reckless

23  disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme

24  emotional distress and (3) actual or proximate causation."  *Dillard Dept. Stores, Inc. v.*

25  *Beckwith*, 989 P.2d 882, 886 (Nev. 1999) (quoting *Star v. Rabello*, 625 P.2d 90, 92 (Nev.

26  1981)).  "[E]xtreme and outrageous conduct is that which is 'outside all possible bounds of

27  decency' and is regarded as 'utterly intolerable in a civilized community.' "  *Maduike v. Agency*

28  *Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (citations omitted).

Plaintiffs have failed to defend their claim of intentional infliction of emotional distress in their opposition to the motion for summary judgment.  Regardless, handcuffing the youth and detaining them for less than forty minutes was not outrageous conduct because the officers reasonably suspected the youth had committed a burglary.  Detaining Sandoval was also not outrageous conduct because he was agitated and failed to obey police orders and the officers had a right to use force on those who present an immediate threat to the officers or others.  *See Cortes v. State*, 260 P.3d 184, 189 (Nev. 2011); *Redeker v. State*, 238 P.3d 848, 2008 WL 6102007, at *3 (Nev. 2008 ) (unpublished opinion).  Shooting the dog as it was lunging at Officer Dunn was not outrageous conduct as Officer Dunn had a right to protect himself from the charging pit bull.  *Cortes*, 260 P.3d at 189.  Even if any of these actions could be deemed to be outrageous conduct, Plaintiffs have provided no evidence that the actions were done with the intention of causing emotional distress or that Plaintiffs suffered severe or extreme emotional distress as a result of the conduct.  Accordingly, summary judgment is granted in favor of Defendants on this claim.

### 2.    Assault and Battery

Plaintiffs have also alleged that the officers committed assault and battery against Plaintiffs.  (Compl. (#15) at 9).  To establish a claim of assault, the plaintiff must demonstrate that the defendant (1) intended to cause harmful or offensive physical contact or an imminent apprehension of such a contact, and (2) the victim was put in apprehension of such contact.  RESTATEMENT (SECOND) OF TORTS § 21 (1965).  As for the tort of battery, a plaintiff must show that the defendant (1) intended to cause harmful or offensive contact or an imminent apprehension of such a contact, and (2) offensive contact occurred.  *Id.* §§ 13, 18.  In the context of an arrest, contact may only constitute an assault or  battery if the officer used unreasonable force in effectuating the arrest.  *Yada v. Simpson*, 913 P.2d 1261, 1262-63 (Nev. 1996), *superseded by statute on other grounds as recognized by RTTC Commc'ns, LLC v. Saratoga Flier, Inc.*, 110 P.3d 24, 29 (Nev. 2005); *see also Castaneda v. Douglas Cnty. Sheriff's Investigator Rory Planeta*, 2007 WL 160816, at *9 (D. Nev. 2007).

1    Plaintiffs have again failed to support their claims for assault and battery in their
2  opposition to the motion for summary judgment.  The conduct here occurred while the officers
3  were effectuating an arrest and the officers did not use an unreasonable amount of force in
4  doing so.  Sergeant Roberts pointed his weapon at the youth and the officers arrested them
5  because they reasonably believed they were committing a burglary.  Officer Dunn shot the dog
6  because it was charging at him.  Sandoval was arrested because he was agitated and failed
7  to comply with the orders from the officers.  Although placing him in the back of the police
8  vehicle may have caused him pain due to his recent back surgery, as stated earlier, police
9  officers are not required to credit every claim of injury.  *See Winterrowd v. Nelson*, 480 F.3d
10  1181, 1184 (9th Cir. 2007).  The force used was therefore not unreasonable and Plaintiffs'
11  claims for assault and battery consequently fail.

12              **3.      False Imprisonment**

13    Finally, Plaintiffs have alleged they were falsely imprisoned by the officers.  (Am.
14  Compl. (#15) at 10).  "To establish false imprisonment of which false arrest is an integral part,
15  it is necessary to prove that the person be restrained of his liberty under the probable
16  imminence of force without any legal cause or justification."  *Hernandez v. City of Reno*, 634
17  P.2d 668, 671 (Nev. 1981) (quoting *Marschall v. City of Carson*, 464 P.2d 494, 497 (Nev.
18  1970)).  A defendant may be liable for false imprisonment where: (1) he intentionally confines
19  the plaintiff within boundaries fixed by the defendant; (2) his act directly or indirectly results in
20  a confinement of the plaintiff; and (3) the plaintiff is conscious of the confinement or is harmed
21  by it.  *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 35 (1965)).  NRS § 171.123(1) however
22  states "[a] peace officer may detain any person whom the officer encounters under
23  circumstances which reasonably indicate that the person has committed, is committing or is
24  about to commit a crime."  Officers are also allowed to protect themselves and detain those
25  who fail to comply with police orders.  *Cortes v. State*, 260 P.3d 184, 189 (Nev. 2011); *see
26  also Redeker v. State*, 238 P.3d 848, 2008 WL 6102007, at *3 (Nev. 2008 ) (unpublished
27  opinion).

28

23

1    The officers here detained Henry, Jordhy, and David under the reasonable belief that
2  a burglary was in progress.  The officers also detained Sandoval because he was agitated and
3  refused to obey the orders of the officers.  Defendants are therefore entitled to summary
4  judgment on Plaintiffs' claim for false imprisonment.

5                                      **CONCLUSION**

6    For the foregoing reasons, IT IS ORDERED that Defendants' motion for summary
7  judgment (#31) is granted.

8

9    DATED:  This 24th day of February, 2012.

10

11

12  _____
    United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28